UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FONTAINEBLEAU FLORIDA HOTEL, LLC,

    Plaintiff,

v.

THE SOUTH FLORIDA HOTEL AND
CULINARY EMPLOYEES WELFARE FUND;
AND UNITE HERE, LOCAL 355,

CASE NO. 1:20-cv-22667

    Defendants.

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, Fontainebleau Florida Hotel, LLC ("Fontainebleau"), seeks declaratory and injunctive relief against Defendants, The South Florida Hotel and Culinary Employees Welfare Fund ("the Fund") and UNITE Here, Local 355 ("the Union"), pursuant to Section 4301(a)(1) of the Employee Retirement Income Security Act of 1974, as added by the Multi-Employer Pension Plans Amendments Act of 1980; the Declaratory Judgment Act, 28 U.S.C. 2201; and Rule 57(a) of the Federal Rules of Civil Procedure, and alleges as follows:

### PRELIMINARY STATEMENT

1. The Fontainebleau Miami Beach Hotel is an historic and architectural landmark in the City of Miami Beach. On March 24, 2020, this iconic hotel was forced to close down all of its operations because of an unprecedented Order from the City of Miami Beach intending to minimize the spread of the COVID-19 pandemic. The full impacts of the COVID-19 pandemic have created the worst business conditions the American lodging and hospitality industry has ever known. The shutdown took Fontainebleau's occupancy rate from approximately eighty percent

1

(80%) annualized down to zero and closed not only the Hotel, but all the restaurants, bars, clubs, spa, pools, and retail that operate on the property. In essence, from a business standpoint, as with so many other hospitality businesses on Miami Beach both large and small, Fontainebleau's revenue flat-lined virtually overnight. The shutdown required Fontainebleau to lay off 2,083 of its roughly 2,151-person workforce, including all 1,077 individuals represented by the Union effective March 30, 2020.

In the face of this crisis for Fontainebleau, the Fund and the Union demanded that Fontainebleau continue to make health care contributions to the Fund on account of the laid-off individuals, despite the fact that they are *no longer employed by* Fontainebleau. The total amount Defendants have claimed that Fontainebleau is or will be obligated to pay is between $ 3.9 Million and $ 5.35 Million in health care contributions to the Fund for those *former employees*. The uncertainty surrounding Defendants' demands for these huge payments has placed and will continue to place Fontainebleau under a financial cloud, as it attempts to re-stabilize itself and regain its ability to again employ 2,000-plus people in the City of Miami Beach.

Because this multi-million dollar demand is contrary to the requirements of the Collective Bargaining Agreement (the "CBA") between Fontainebleau and the Union, and because the payments demanded are prohibited by the trust instrument under which the Fund is maintained, Fontainebleau has been forced to bring this action to resolve the controversy between itself and the Defendants.

## THE PARTIES

2.      Plaintiff, Fontainebleau, operates one of the most historically and architecturally significant hotels on Miami Beach. Opened in 1954 and designed by Morris Lapidus, it was arguably the most luxurious hotel on Miami Beach. The hotel reopened in 2008 following a major

renovation and now has 1504 rooms and suites; 12 restaurants and bars; a 40,000-square-foot spa; and an oceanfront poolscape.

3. Defendant, The South Florida Hotel and Culinary Employees Welfare Fund, is a multi-employer employee benefit plan within the meaning of ERISA § 37(A)(i)(ii), with its principal place of business at 2010 NW 150th Ave., Suite 100, Pembroke Pines, Broward County, Florida 33028.

4. Defendant, UNITE HERE, Local 355, is an employee organization within the meaning of ERISA § 3(4). The Union is a party to the CBA (relevant portions attached as Exhibit 1) which defines the scope of the obligation of Fontainebleau to contribute to the Fund. Its principal place of business is located at 871 NW 167 Street, Miami Gardens, Miami-Dade County, Florida 33169. The Union represents about 1,077 of the total 2,151 employees and former employees that work or worked in all parts of the Fontainebleau Miami Beach Hotel.

## SUBJECT MATTER JURISDICTION

5. This Court has subject matter jurisdiction over this action under 28 U.S.C. 1331 because the action arises under federal law. Fontainebleau's substantive cause of action arises under ERISA § 4301(a)(1), which creates a cause of action for Fontainebleau because Fontainebleau is adversely affected by the Fund's May 14 and June 12, 2020 demands for payment of allegedly due delinquent contributions, plus penalties and fees, which the Fund asserts were required by the CBA to be paid by May 10 and June 10, 2020, respectively. *See* May 14 and June 12, 2020 demand letters, attached hereto as composite Exhibit 2.

6. Fontainebleau asserts that it does not owe contributions for the period in question because the former bargaining unit employees were laid off as of March 30, 2020 and, accordingly, are no longer employees for whom contributions must be paid to the Fund pursuant to the CBA.

Pursuant to ERISA § 4301(a)(1), the Fund could commence an action, as threatened in Exhibit 2, against Fontainebleau to collect the claimed delinquencies in contributions. That the Fund has the potential to so enforce its claims, set forth in Exhibit 2, gives Fontainebleau standing to bring this action for a Declaratory Judgment, and this Court has subject matter jurisdiction over the cause of action pursuant to 28 U.S.C. 1331 because the Fund's potential cause of action raises a federal question under ERISA.

7. Further, subject matter jurisdiction for this action is also provided by Section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. §185 (the "LMRA"), and federal common law, as the Union's and Fund's actions are in violation of the CBA between the Union and Fontainebleau.

## VENUE

8. Venue is appropriate in the Southern District of Florida, pursuant to 28 U.S.C. 1391(b)(2), because the principal place of business of Fontainebleau is in Miami-Dade County, and the hotel is located in the Southern District. The Union and the Fund are also both located in the Southern District. Most, if not all, of the bargaining unit employees under the CBA, and former employees since lay-off, reside in the Southern District of Florida and performed the work in the Southern District, which work determines coverage or exclusion from contributions to the Fund under the terms of the relevant contracts and other documents.

## FACTS SUPPORTING CLAIMS FOR RELIEF

9. As noted in Paragraph 5, Fontainebleau received letters dated May 14 and June 12, 2020 asserting that it owes contributions to the Fund that it alleges were due on May 10 and June 10, 2020. Exhibit 2. Due to recent events, it is now foreseeable that many of the layoffs will continue in excess of six months, as a result, the amount in controversy is likely to total between

$ 3.9 Million and $ 5.35 Million, depending on how many of its former employees Fontainebleau can return to employment and when.

10. As stated above, on March 30, 2020, Fontainebleau was forced to lay off all 1,077 individuals represented by the Union after the hotel was legally required to close pursuant to an Order from the City of Miami Beach.

11. Fontainebleau's rights and obligations in regard to the bargaining unit are governed by the CBA. The CBA states that the Fontainebleau "retains its inherent right … to determine the number of employees required." Exhibit 1, Article 8. The CBA further describes Fontainebleau's right to conduct layoffs of employees when necessary. In Article 11, the CBA states the employer shall have the right during slack periods of business to "**reduce the number of employees**…." Accordingly, by this provision, the parties to the CBA set forth their agreement that when individuals are laid off, they are no longer "employees." Exhibit 1, Article 11 (emphasis added).

12. As relevant to the period here, Fontainebleau's obligation to contribute to the Fund is likewise defined by the terms of the CBA.

13. Under the CBA, Fontainebleau was obligated to contribute only for current eligible employees. The CBA states as follows in pertinent part:

> Section 1: The Total Health and Welfare (including Dental and Administration) contributions rate is $645.47 and shall increase to $753.16 as of October 1, 2017. Contributions shall be increased by 9% on July 1 of each subsequent year of this Agreement.
>
> The Employer shall pay the contribution as set forth above for each eligible **employee** covered by this Agreement and transmit this sum each month to said Fund no later than the 10th day of the following month, together with the names, social security numbers, and total hours paid for the employees for whom payments were made upon forms required by the Fund."

Exhibit 2, Article 28 (emphasis added).

14. Accordingly, pursuant to the CBA, Fontainebleau does not owe contributions for individuals who were laid off because they were no longer "employees" as of March 30, 2020.

15. Further, ERISA § 402(a)(1) provides that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument," and Section 402(b) and subdivision (iv) provides that "[e]very employee benefit plan shall . . . specify the basis on which payments are made to and from the plan." The terms of the Fund's Trust Agreement describe an employer's contribution obligations by referring back to the terms of the CBA, as follows:

> Section 4.1 Employer Contributions.
>
> > (a) Each Employer shall make prompt contributions or payment to the Trust Fund in such amount and under the terms as are provided for in the applicable collective bargaining agreement in effect from time to time between the Employer or his bargaining representative and the Union. An Employer may also be required to make contributions in such amount and under such terms as agreed to by such Employer in writing, provided that such contributions shall be subject to acceptance by the Trustees. The Employer agrees that such contributions shall constitute an absolute obligation to the Trust Fund, and such obligation shall not be subject to, by way of illustration and not limitation, set-off or counterclaim which the Employer may have for erroneous contributions to any other Trust Funds, or for any other liability of the Union, of an Employee, or any other Trust Funds, or for any other liability of the Union, of an Employee, or any other person.

Fund Trust Agreement, attached hereto as Exhibit 3. ERISA § 404(a)(1)(D) requires that the Fund be administered "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV." Accordingly, it would be a violation of ERISA and a breach of fiduciary duties for the Fund to accept contributions from Fontainebleau that are not provided for in the CBA.

16. The Fund's Trust Agreement further defines "Employee" to require that, *inter alia*, the individual be "working for an Employer." Exhibit 3, Article 1, Section 1.9. The Trust Agreement states:

6

> **Section 1.9  Employee**.  The term "Employee" as used herein shall mean:
>
> (a) Any Employee represented by the Union and working for an Employer as defined herein, and with respect to whose employment an Employer is required to make contributions into the Trust Fund.

*Id.*  It is axiomatic that the individuals on lay-off are no longer "working" for Fontainebleau and some may never return to employment.

17. Fontainebleau is only obligated to make contributions to the Fund for "eligible employees."  After a formal layoff, the laid-off worker is no longer an "employee," but is merely an individual with a contractual, contingent right to recall for a set period of time.  No UNITE HERE bargaining unit employees of Fontainebleau worked any hours in April 2020 or were otherwise employed.  By the terms of the CBA, Fontainebleau is not obligated to continue to make contributions to the Fund for these former employees unless and until they actually resume their employment.

18. Even if Fontainebleau could be found to continue to be obligated to make contributions to the Fund for its laid off workers, that obligation would be eliminated based on the catastrophic negative impact on the hotel caused by the forced closure of the hotel as a result of safety measures implemented to attempt to prevent the further spread of the COVID-19 pandemic. This pandemic-caused forced closure constitutes a force majeure or "act of God" that has made performance of that obligation impossible.

19. Similarly, Fontainebleau had to act immediately to preserve its viability given the "economic exigencies" that compelled "prompt action." The forced closing caused by the COVID-19 pandemic constitutes "extraordinary events" that: (1) had a "major economic effect;" (2) required the employer "to take immediate action;" and (3) were "caused by external events,"

"beyond the employer's control," and were "not reasonably foreseeable." Fontainebleau is excused from making contributions to the Fund based on these factors.

20. In May and June 2020, Fontainebleau recalled 361 former employees represented by the Union and has made and will make the required contributions to the Fund for those individuals that have returned to employment.

**THE DISPUTE BETWEEN THE FUND AND FONTAINEBLEAU IS SUFFICIENTLY ADVERSARIAL, CONCRETE, IMMEDIATE, AND CAPABLE OF COMPLETE AND AUTHORITATIVE JUDICIAL DETERMINATION TO JUSTIFY A DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. §§ 2201-2202 AND A PERMANENT INJUNCTION TO ENFORCE THAT DETERMINATION.**

21. The May 14 and June 12, 2020 letters from the Fund demanding contributions (Exhibit 2), coupled with the clear disagreement between the parties as to the individuals for whom contributions to the Fund are required, create an immediate, concrete, adversarial dispute which can, and should, be resolved by a Declaratory Judgment pursuant to 28 U.S.C. §§ 2201-2202, which judgment will fully and authoritatively declare the respective rights and obligations of the Fund and Fontainebleau.

**FONTAINEBLEAU IS ENTITLED TO A STAY OF THE GRIEVANCE ARBITRATION INITIATED BY THE UNION PERTAINING TO WHETHER IT OWES CONTRIBUTIONS TO THE FUND FOR FORMER, LAID OFF, EMPLOYEES.**

22. The Union has initiated a grievance arbitration against Fontainebleau in which it contends that Fontainebleau owes contributions to the Fund in May, 2020 for former employees laid off due for the month of April (when no bargaining unit members were employed) and has recently claimed that it is "amending the allegation to assert a continuing violation, which includes the hotel's failure to make such payments in June and July (assuming that the hotel fails to do so)." The Union's grievance alleges that the CBA requires these payments to the Fund despite the fact that the contributions, if any, are owed to the Fund and the Fund is the only entity that has a viable

8

claim to such amounts. Allowing the arbitration process to go forward will cause Fontainebleau irreparable harm because it will force Fontainebleau to litigate the same issue before two different tribunals with potentially conflicting results.

23. The CBA, Article 26, Section 12, permits this Court to issue a stay of any arbitration, as it states in pertinent part as follows [typographical error in original]:

> Section 12: The arbitration herein described shall proceed to completion upon the merits unless the party objecting hereto obtains a court order stating such arbitration.

Exhibit 2, Article 26.

24. Fontainebleau is entitled to a stay of the arbitration proceedings pending this Court's ruling as to whether it owes contributions to the Fund for individuals who have been laid off.

25. A stay of the arbitration by virtue of this Court's exercise of its traditional power to order injunctive relief is warranted as a matter of law because the real party in interest as to benefit contributions is the Fund, not the Union. A stay of the arbitration would preserve the *status quo* until such time as this Court determines the legal issues described in Plaintiff's claim for declaratory relief. Fontainebleau will be irreparably harmed by permitting the grievance arbitration to proceed because the Fund, a non-party thereto, would not be bound by any decision by the arbitrator on the issue of the duty to contribute and Fontainebleau would then be exposed to a subsequent federal collection suit by the Fund even if Fontainebleau prevails in arbitration. Allowing the arbitration to proceed would, therefore, expose Fontainebleau to unnecessary expenditure of fees, expenses, and labor in defending the arbitration at a time when preserving funds and devoting managerial attention to re-opening are of the utmost importance to seeing the

9

Fontainebleau Miami Beach Hotel resume its place in the life and the economy of Miami Beach. This Court is, therefore, the proper forum to afford all parties complete and final relief.

26. Fontainebleau has a great likelihood of success on the merits pursuant to the allegations set forth above in that, under the CBA, Fontainebleau is only obligated to make contributions to the Fund for "eligible employees." After a formal layoff, the laid-off worker is no longer an "employee," but is merely an individual with a contingent right to recall for a set period of time.

27. Defendants will not suffer any harm from the injunction because this Court will decide the very issue on which the Union seeks a decree in the arbitration, and will do so pursuant to the Federal Rules of Civil Procedure, which are "[to] be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every [civil] action and proceeding." By contrast, the threat of monetary injury to Fontainebleau at this time of immense financial uncertainty and hardship caused by the global pandemic outweighs whatever supposed damages the Defendants may claim they will suffer because of the proposed injunction. This imbalance is all the more pronounced because, if Fontainebleau prevails in the arbitration, the grievance arbitration would not bind the Fund. An order staying the grievance arbitration would not expose the Union to any damage as any contributions that may be owed will only be payable to the Fund and not the Union.

28. Finally, the public interest favors the issuance of an injunction staying the grievance arbitration because this Court has the power and jurisdiction to issue a final declaration as to the rights and obligations of all interested parties in an efficient manner without unnecessary expenditure of fees, costs, and other expenditures.

29. Moreover, the continuation of the arbitration process poses two threats to this Court's jurisdiction to proceed with this matter. First, the rules governing the arbitration process are very different from the Federal Rules of Civil Procedure and the Federal Rules of Evidence. Thus, having arbitration conducted on a separate track is a threat to this court's ability to control the process by which the issue in this case will be decided. Second, if by some chance the arbitration concludes before this Court renders its judgment in this case, Defendants may argue that the arbitral award is binding on this court under the doctrines governing issue and/or claim preclusion, effectively depriving this Court of the power to decide the issue for itself.

30. Fontainebleau has retained undersigned counsel to represent it in connection with this action and has and will continue to incur legal expenses including costs and attorneys' fees in connection with pursuing the relief described herein.

WHEREFORE, Fontainebleau requests the following relief:

1. The Court enter a Declaratory Judgment, pursuant to 28 U.S.C. §§ 2201-2205, that (a) each of the laid off former employees of Fontainebleau was not an eligible employee under the CBA from the date of his or her lay off until the date, if any, on which he or she was recalled by Fontainebleau and returns to employment in a bargaining unit position; and (b) Fontainebleau has no obligation to make health care contributions to the Fund with respect to any of the laid off, former employees of Fontainebleau as they are not covered an eligible employees under the CBA from the date of his or her lay off until the date, if any, on which he or she was recalled by Fontainebleau and returns to employment in a bargaining unit position; and

2. The Court grant an injunction enjoining the Fund and the Union or either of them from commencing or maintaining any action or proceeding in law or equity in any court, federal

or state, or before any tribunal, to collect contributions claimed to be delinquent for the laid off former employees of Fontainebleau;

    3.    The Court issue injunctive relief in the form of an order, pursuant to the terms of the CBA, Article 26, Section 12 (Exhibit 1), staying the grievance arbitration initiated by UNITE HERE, Local 355 against Fontainebleau;

    4.    The Court enter an order, pursuant to Section 4301(e), directing the Fund to pay the reasonable attorney fees and costs of litigation incurred by Fontainebleau, in the prosecution of this action.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

*/s/ Russell S. Buhite*

Russell S. Buhite, FL 0831085
Russell.Buhite@ogletree.com
1201 Third Avenue, Suite 5150
Seattle, WA 98101
Telephone: 206-693-7057
Fax: 206-693-7058

*/s/ S. Kathleen Massing*
S. Kathleen Massing, FL 0722219
Kathleen.Massing@ogletree.com
100 North Tampa Street, Suite 3600
Tampa, FL  33602
Telephone:  813-289-1247
Facsimile:  813-289-6530

*Attorneys for Plaintiff FONTAINEBLEAU, HOTEL FLORIDA, LLC*

43317811.1