# EXHIBIT 1

# COLLECTIVE BARGAINING AGREEMENT

Between

Fontainebleau Florida Hotel, LLC
(d/b/a Fontainebleau Miami Beach)

and

UNITE HERE, Local 355

July 1, 2017 - June 30, 2022

## Table of Contents

| | Page |
|---|---|
| PREAMBLE | 1 |
| ARTICLE 1 – BARGAINING UNIT | 1 |
| ARTICLE 2 – NO DISCRIMINATION | 4 |
| ARTICLE 3 – UNION SECURITY & CHECK-OFF | 5 |
| ARTICLE 4 – UNION VISITATION | 5 |
| ARTICLE 5 – SHOP STEWARDS | 6 |
| ARTICLE 6 – HIRING OF EMPLOYEES | 6 |
| ARTICLE 7 – PROBATION | 7 |
| ARTICLE 8 – MANAGEMENT | 7 |
| ARTICLE 9 – NO STRIKE / NO LOCKOUTS | 7 |
| ARTICLE 10 – SENIORITY FOR EMPLOYEES | 8 |
| ARTICLE 11 – LAYOFF | 9 |
| ARTICLE 12 - DISCIPLINE AND DISCHARGE | 9 |
| ARTICLE 13 - WAGES & CLASSIFICATIONS | 11 |
| ARTICLE 14 - HOURS & OVERTIME | 12 |
| ARTICLE 15 - VACATIONS | 14 |
| ARTICLE 16 – HOLIDAY PAY | 14 |
| ARTICLE 17 - SERVICE CHARGES & INSPECTIONS | 15 |
| ARTICLE 18 - BEREAVEMENT PAY | 20 |
| ARTICLE 19 - JURY PAY | 20 |
| ARTICLE 20 - MEALS | 20 |
| ARTICLE 21 – UNIFORMS | 21 |
| ARTICLE 22 - LOCKERS AND SANITATION | 21 |
| ARTICLE 23 - UNION PINS | 21 |
| ARTICLE 24 - BULLETIN BOARD | 21 |
| ARTICLE 25 - TRAINING PROGRAMS | 21 |
| ARTICLE 26 - GRIEVANCE AND ARBITRATION | 22 |
| ARTICLE 27 - PENSION BENEFIT | 24 |

ARTICLE 28 - HEALTH BENEFITS .................................................................................................... 26
ARTICLE 29 - SUCCESSOR CLAUSE ................................................................................................ 27
ARTICLE 30 - RELIEF APPEALS ....................................................................................................... 28
ARTICLE 31 - PAID SICK LEAVE ...................................................................................................... 28
ARTICLE 32 - GUEST SERVICE COMMITMENT ............................................................................. 28
ARTICLE 33 - DRUG AND ALCOHOL POLICY ................................................................................ 29
ARTICLE 34 – ORIENTATION .......................................................................................................... 29
ARTICLE 35 – HOUSEKEEPING ....................................................................................................... 29
ARTICLE 36 - FAVORED NATIONS ................................................................................................. 31
ARTICLE 37 - PARKING .................................................................................................................... 31
ARTICLE 38 - HEALTH AND SAFETY .............................................................................................. 32
ARTICLE 39 - CIVIL RIGHTS ............................................................................................................ 32
ARTICLE 40 – IMMIGRANTS' RIGHTS ........................................................................................... 33
ARTICLE 41 - Hospitality Employees Advancement and Training (HEAT) Fund ........................... 34
ARTICLE 42 - AGENCY EMPLOYEES IN HOUSEKEEPING ........................................................... 35
ARTICLE 43 - COMPLETE AGREEMENT ........................................................................................ 36
ARTICLE 44 – DURATION ................................................................................................................ 36

## LABOR AGREEMENT

This collective bargaining agreement is entered into this __ day of March 2018 by and between Fontainebleau Florida Hotel, LLC, doing business as Fontainebleau Miami Beach (hereinafter termed the "Employer") and UNITE HERE Local 355 (hereinafter termed the "Union") to be effective on July 1, 2017, unless otherwise agreed.

## PREAMBLE

WHEREAS, the Union represents all of the employees in the unit set forth below, and

WHEREAS, both the Employer and the Union desire to establish general standards of wages, hours and working conditions, and

WHEREAS, both the Employer and the Union desire to establish and ensure a peaceful, speedy, and orderly adjustment of differences and grievances which may from time to time arise between the parties, and

WHEREAS, both the Employer and the Union desire to provide for the employees a meaningful, healthful, and profitable employment,

WHEREAS, both the Employer and the Union are committed to providing the finest possible guest experience in terms of luxury service and a total quality guest experience environment,

WHEREAS, all the parties to this CBA will continue to strive to foster improved teamwork, improved cooperation between employees, departments and managers so that the guest experience is enhanced and maximized,

WHEREAS, both the Employer and the Union will seek to implement these ideals, and reach the above goals, through a unified approach to all problems solving and work tasks so that no guest need is denied, or impacted by the failure of a manager or employee to take ownership of a problem, ignore an opportunity to actively resolve guest service issues no matter how small or removed from that person's area of responsibility,

WHEREAS, it is to the above ideals and standards that this contract is dedicated and must be interpreted by both parties so as to effectuate and implement these goals, and

WHEREAS, both the Employer and the Union desire to contribute to the stability and economic progress of the community in which both reside, now therefore it is agreed as follows:

## ARTICLE 1– BARGAINING UNIT

Section 1: The Employer recognizes the Union as the exclusive bargaining representative for employees employed at Fontainebleau Miami Beach in the departments and classifications as set forth in Schedule A, but excluding all departments and classifications not listed in Schedule A as well as executives, department heads, managerial employees, security officers, International Hospitality Exchange Program students (IHEP), and all other supervisors as defined by the National Labor Relations Act. The Employer agrees to provide the Union with advance notice of the start and end dates for any new classes of IHEP students and shall not utilize more than 35 IHEP students at any time or bring in any

new classes of IHEP students if there are no open Commis 1 or Commis 2 positions. During the term of this Agreement, the Employer will endeavor to hire locally for any open bargaining unit positions with a goal of reducing or eliminating the number of IHEP students.

Section 2: The Union and the Employer agree that supervisory personnel will not perform duties which are currently done by employees covered by the scope of this Agreement except in an emergency or on an occasional and necessary basis for the purpose of meeting a specific demand of service. Examples of such instances include, but are not limited to, unforeseen occurrences, instances of training, troubleshooting, a change in operational procedures, if unit employees are not readily available (until such time a unit employee is available). Under no circumstances would this have the purpose or effect of eliminating any scheduled position or hours.

Section 3: Employees in the following departments and classifications shall be included in the bargaining unit and shall be covered by the CBA:

| Vida |
| --- |
| Bar Back |
| Busser |
| Host/Hostess |
| Runner |
| Server |
| Service Bartender |

| Cafe 54 (EDR) |
| --- |
| Busser/Runner |
| Server/Busser |

| In room Dining |
| --- |
| Order Taker/Cashier |
| Server |
| Busser |
| Service Bartender |

| Private Bars |
| --- |
| Private Bar Attendant |

| Catering Banquets |
| --- |
| Banquet Bar Back |
| Banquet Bartender |
| Banquet Cashier |
| Banquet Porter |
| Banquet Server |
| Banquet Coffee Breaker |
| Banquet Linen Attendant |

2

| Culinary |
|---|
| Chef de Partie |
| Commis 1 |
| Commis 2 |

| Stewarding |
|---|
| Kitchen Worker 1 |
| Kitchen Worker 2 |

| Warehouse and Receiving |
|---|
| Storeroom Clerk |

| Purchasing |
|---|
| Mail Clerk |

| Communications |
|---|
| Telephone Operator |

| Front Service |
|---|
| Baggage Handler |
| Bell Captain |
| Bell Dispatcher |
| Bellperson |
| Doorperson |

| Housekeeping |
|---|
| Balcony Cleaner |
| Drapery Attendant |
| Houseperson |
| Turndown Attendant |
| Room Attendant |
| Room Attendant - Condo |
| Utility Porter |
| Guest Service Response Attendant |
| Wardrobe Attendant |
| Seamstress |

| Laundry/Linen |
|---|
| Laundry Attendant |
| Linen Attendant |

| Internal Maintenance |
|---|

3

| |
|---|
| Night Cleaner<br>Public Area Attendant<br>Utility Porter |

| |
|---|
| Engineering<br><br>Aquatic Engineer<br>Carpenter 1<br>Electrician 1<br>Electrician 2<br>General Maintenance<br>Kitchen Mechanic 1<br>Kitchen Mechanic 2<br>Laborer<br>Mechanic 1<br>Mechanic 2<br>Painter 1<br>Painter 2<br>Plumber 1<br>Plumber 2<br>Refrigeration/AC 1<br>Refrigeration/AC 2<br>Stationary Engineer 1<br>Stationary Engineer 2<br>Storeroom Attendant<br>Yardmen |

Section 4: Employees in the following food and beverage venues shall not be included in the bargaining unit, nor shall they be covered by the CBA: All current and future specialty restaurants, lounges, and Outdoor bars/restaurants, in all "front of house" job classifications, including but not limited to:
- Host
- Bartender
- Bar Back
- Busperson/Runner
- Food Server/Gourmet
- Beverage Server
- Lead Beverage Server
- Sommelier Tea/Wine
- Apprentice Bartender/Bar Back

For clarity, Vida is the only restaurant outlet where "Front of house" classifications are included in the bargaining unit. Employees in the Sous Chef, Chef de Cuisine, Artisan Baker Chef, Pastry Artist, and Pastry Artist Chocolate job classifications shall not be included in the bargaining unit, nor shall they be covered by the CBA.

## ARTICLE 2– NO DISCRIMINATION

There shall be no discrimination by the Employer or the Union against any employee on account of membership in or activity on behalf of or against the Union. In accordance with applicable laws, there

any employee hired to replace such employee in the prior position will be subject to layoff or return to their prior position.

## ARTICLE 7– PROBATION

Section 1: All newly hired employees shall work a ninety (90) day probationary period, which ninety (90) days must be accrued during which time the Employer will review the employee's ability and demeanor and during which time the Employer may discharge said employee with or without cause and without right to review by the grievance and arbitration procedure.

Section 2: Probationary employees are not eligible for leave of absence.

Section 3: Probationary period may be extended by up to thirty (30) calendar days by the Employer with written notice to the Union if the employee has not worked 45 shifts in his/her first ninety (90) calendar days.

## ARTICLE 8– MANAGEMENT

Section 1: The Employer retains the exclusive right to plan, determine, direct, and control the nature and extent of all of its kitchen, housekeeping, dining room, bar and allied operations, maintenance requirements, and all other departments and to install or introduce any new or improved production methods or facilities and to maintain efficient operations. The Employer retains its inherent right to direct and control its working force personnel and to determine the number of employees required. The Employer retains all rights and authority, except as specifically abridged, delegated, or modified by this collective bargaining agreement.

Section 2: The Employer shall have the right to make such reasonable rules and regulations, and revise the same, as it may deem necessary and proper for the conduct of its business, provided, however, that such rules and regulations shall not be inconsistent with this Agreement. In accordance with the NLRA, the employer shall notify the union of proposed changes involving mandatory subjects of bargain under the National Labor Relations Act that are not addressed elsewhere in this agreement, and will give the union an adequate opportunity to bargain prior to implementation. Should no agreement be reached as a result of bargaining or in the absence of bargaining, the Union may timely contest the propriety of the Employer's rule through the grievance and arbitration process. The Company Handbook, as of June 26, 2017, is incorporated by reference into this Collective Bargaining Agreement.

## ARTICLE 9– NO STRIKE / NO LOCKOUTS

Section 1: Both the Union and the Employer recognize the service nature of the hotel business and the duty of the hotel operators to render continuous and hospitable service to the public in the way of lodging, food, and other necessary hotel accommodations.

Section 2: Therefore, the Union agrees that it will not call, engage, participate, or sanction any strike, sympathy strike, stoppage of work, picketing of the hotel, sit-down, sit-in, boycott, refusal to handle merchandise, or any other interference with the conduct of the Employer's business, for any reason whatsoever; nor will it interfere with any guest or tenant at the hotel, while he is a guest or tenant occupying a room or space, who sells or exhibits nonunion- made merchandise or employs non-union help.

Section 3: The Employer agrees it shall not lockout its employees or any part of its employees.

Section 4: Any such act by the Union, any bargaining unit employee, or the Employer shall be a violation of this Agreement, and the same, including any and all disputes in reference thereto, shall be submitted as any other dispute under this Agreement to arbitration. This provision, however, shall in no way limit either Party's ability to seek immediate injunctive relief from a court in the event of any breach or threatened breach of this Article by the Union or any bargaining unit employee(s) or the Employer.

Section 5: During the term of this Agreement there shall be no lockout, strike, or stoppage of any kind, pending the determination of any complaint of grievance and for a period of the ten (10) days after the rendition of the arbitrator's award and then only for the refusal of either party to abide by such arbitrator's award.

## ARTICLE 10– SENIORITY FOR EMPLOYEES

Section 1: The seniority provisions hereinafter set forth shall have application only to all bargaining unit employees after the completion of the probationary period.

Section 2: Seniority with the Employer shall be computed from the day an employee commences work.

1) Hotel seniority shall be defined as an employee's last date of hire by the hotel in a position without a break in service resulting in a loss of seniority.

2) Classification seniority shall be defined as an employee's last date of hire into his/her current classification where outlet classification seniority is not applicable.

3) Outlet Classification seniority shall be defined as an employee's last date of hire as a Chef de Partie, Commis 1 or Commis 2 in the following outlets: Pastry, Butchery, Garde Manger, Banquets, Stripsteak by Michael Mina, Hakkasan, Scarpetta, Fresh, Pizza & Burger by Michael Mina, La Cote, and Blade and a combination outlet of Vida, and In Room Dining.

Application of Seniority:

a) Hotel seniority shall apply to benefits.

b) Classification seniority shall apply to layoffs and recall. However, for culinary employees, Hotel seniority shall apply to layoffs and recall.

c) Preference for shifts, days off, holidays, and vacations shall be by classification seniority, and outlet classification seniority where applicable, provided that, such preferences do not affect the best interest of the Employer as determined by reasonable exercise of its discretion.

Section 3: Seniority shall continue to be considered unbroken when an employee cannot work while on a leave of absence for accident, illness, pregnancy related disability, induction into the Armed Forces of the United States of America, or such other conditions as authorized under FMLA, or when granted a personal leave of absence by the Employer, provided, however, such voluntary leaves shall not exceed a period of one (1) month. The Employer and Union may, however, for good cause, provide for extensions.

Section 4: Employees may lose seniority for:

a) Voluntary quit, or

8

    b) Discharge for cause, or
    c) Failure to respond to recall notice mailed to last known address within one (1) week, or
    d) Lay-off for a period of over one (1) year or
    e) Absent for longer than 6 months due to illness not compensable under Florida Industrial Insurance Act, or
    f) Absent longer than authorized leave of absence.

Section 5: When two employees are hired on the same date, seniority shall be determined by using the last four digits of the employee's valid Social Security number (highest number equates to most seniority).

### ARTICLE 11– LAYOFF

Section 1: The Employer shall have the right during the slack periods of business to reduce the number of employees in the various classifications as it may deem appropriate in its best business judgment, provided the Employer observes all provisions of this Collective Bargaining Agreement.

Section 2: The Hotel shall provide the Union with advance notice of a layoff within a reasonable time after it decides a layoff will occur and an opportunity to bargain about a potential layoff over issues such as selection of employees for the layoff and alternative procedures. Bargaining shall be expedited and commence immediately. If no agreement is reached within five (5) business days of receipt of the Hotel's notice, the Hotel can proceed with the layoff as originally proposed, unless otherwise mutually agreed.

Section 3: A recall list shall be established that will include all employees laid off from employment. A laid-off employee shall have recall rights for one (1) year. Recall shall be accomplished in reverse order of layoff, by outlet classification, or classification seniority, whichever is applicable under Article 10, Section 2. Employees shall be notified of a recall by certified mail to the employees' last known address in English, Spanish and Creole. Employees on the recall list are responsible for updating their current addresses. The Hotel shall notify the Union of any recalls. An employee may be recalled to any position for which he/she is qualified, in the judgment of the Hotel. An employee may refuse recall to a position outside of his/her classification and will remain on the recall list until a position becomes available within his/her classification for up to one (1) year after his/her layoff. An employee who chooses to accept recall must accept recall within forty-eight hours (48 hours) from actual receipt or personal communication of the recall notice or five (5) calendar days, whichever is less, and must report to work no later than seven (7) calendar days from the date of receipt or notice, or waive all recall rights. An employee on layoff shall be automatically removed from the recall list 1) upon non-response to a recall notice received or failure to timely report to work after accepting recall; 2) one (1) year following layoff; or 3) ifs/he accepts another position with the Hotel.

### ARTICLE 12- DISCIPLINE AND DISCHARGE

Section 1: The Employer shall have the right to discipline or discharge for just cause. The words "just cause" as used in this Agreement shall include the following items:

    a) Drinking or being under the influence of alcoholic beverages or use of controlled substances during working hours.
    b) Insubordination.
    c) Dishonesty.
    d) Fighting on the premises.

Section 2: All employees attending training on a regular day off shall receive a minimum of four (4) hours pay. Failure to attend mandatory trainings may result in disciplinary action according to the Attendance Policy so long as the training has been scheduled according to Article 14, Section 6. An employee will be granted a leave of absence without pay and benefits for a period of up to one year in order to participate in Union-sponsored training programs. Requests for such leave of absence will not be unreasonably denied. An employee who participates in a Union sponsored training program shall maintain his/her seniority.

Section 3: The Union and the Hotel mutually agree to establish a cross-training program for the purpose of allowing employees to enhance their skills and experience and for the purpose of offering additional opportunities to employees. The parties agree that the cross-training program is not for the purpose of creating a "utility-like" classification. In order to get a cross-training program started, the parties agree to initially cross-train employees in the Banquet Department. Thereafter, by mutual agreement, the Union and the Hotel may extend the cross-training program to additional departments.

The cross-training program will work as follows:

- Market cross-training program and gather a list of employees who are interested in working extra hours for the Banquet Department.
- Once a cross-training list is determined, the department will lead a training program for those interested and qualified employee. Employees participating in such training shall be paid at the "training rate". Not all employees will qualify; qualifications will be determined by the department providing the cross training/lateral service.
- Employees should have completed at least 3 months in their current position.
- Employees must notify their department managers that they have signed up for cross training/lateral service.
- Employees must complete a position certification held by the department's trainers.
- After successful completion of the position certification program, employees will be placed on a departmental list to be called if extra help is needed. Employees will be called in order of their seniority, provided that employees regularly scheduled for less than 40 hours will have first preference (in order of seniority). Employees may only cross-train outside of their regularly scheduled work week.
- The borrowing department will pay the rate of the borrowing department and any overtime incurred by the employee. The employee's current home department will have priority over scheduling. Therefore, the lateral service department schedule cannot conflict with that of the home department.
- An employee who violates a company standard while working in the lateral service department will be subject to disciplinary action based on their current disciplinary status.

All hours worked as part of the cross-training program will apply to hours required to qualify for benefits.

### ARTICLE 26- GRIEVANCE AND ARBITRATION

Section 1: Any grievance other than a discharge case shall be processed in the following manner and every effort shall be made by the parties to secure the prompt disposition thereof.

Step 1: Grievances shall be discussed by the affected employee and shop steward or union representative with the affected employee's immediate supervisor provided said grievance is presented within seven (7) calendar days from the date of occurrence giving rise to the grievance.

22

Step 2: Should no satisfactory settlement be made of the grievance at Step 1, the union representative may appeal the grievance to the department head or his/her designee within the department. Such appeal must be made in writing on the Union Grievance Form to the extent practicable (but the grievance shall thereafter be reduced to a form within 48 hours) within seven (7) calendar days of the presentation of the grievance to the immediate supervisor.

Step 3: Should no satisfactory settlement be made of the grievance in Step 2, the union representative may appeal the grievance to the Hotel labor relations representative or his/her designee. Such appeal must be in writing on the Union Grievance Form within seven (7) calendar days of the presentation of the grievance to the department head.

Arbitration: Should no satisfactory settlement be made of the grievance at Step 3, the union representative may appeal the grievance to arbitration. Such appeal must be served in writing by certified mail within fourteen (14) calendar days of the presentation of the grievance to the Vice President of Human Resources or his/her designee. Arbitrations must be filed within thirty (30) days of the completion of the grievance procedure.

Section 2: Any grievance over a discharge shall be filed in writing within seven (7) calendar days of the discharge at Step 2, but any meeting on a discharge grievance shall be held in Human Resources with the Division Head present.

Section 3: Any dispute appealed to Arbitration shall proceed in the following manner:

a. may be submitted to final and binding arbitration. A seven-name panel of available arbitrators shall be requested from the Federal Mediation and Conciliation Service;

b. A representative of the Union and a representative of Management will then agree on a single arbitrator from the FMCS supplied list to hear and determine the matter;

c. In the event the representatives are unable to agree on the selection of an arbitrator from this list, then the representatives will, by lot, determine who goes first and will proceed in an alternative manner to strike names from the list with the final name remaining to be selected as the arbitrator;

d. The selected arbitrator will then be engaged.

Section 4: As promptly as possible after the arbitrator has been selected, he/she shall conduct a hearing between the parties and consider the subject matter of the dispute. The arbitrator shall render a decision not later than thirty (30) calendar days from the date of the hearing and such decision will be served on the Employer and the Union in writing and will be final and binding on both parties.

Section 5: The Employer may introduce into evidence at arbitration copies of written guest complaints (redacted to protect guest identifying information only) that have previously been provided to the Union, if requested.

Section 6: The arbitrator may render an ex parte default award. Both parties agree that a judgment may be entered enforcing any award rendered as above in the courts of the State of Florida or in the United States District Court having jurisdiction over the sites of the principal office of the Employer.

Section 7: The arbitrator shall have jurisdiction and authority to apply, interpret, and determine compliance with the terms of this Agreement, but may not add to, deviate from, detract from, or alter in

any way the provisions of this Agreement. The decision of the arbitrator shall be confined to the matter submitted to him for arbitration.

Section 8: The expenses and fees of the arbitrator, court, reports, transcripts, and room facilities for the arbitration, if any, shall be shared equally by the parties. Each party shall make arrangements for and pay the witnesses who are called by them.

Section 9: The time limits specified in this Article may be extended by mutual agreement in writing.

Section 10: Notwithstanding the provisions of this Article, the parties are free to mutually agree upon a manner, other than arbitration, in which they dispose of any grievance.

Section 11: The arbitration procedure described herein may be instituted only by either the union or the Employer and by no other person, party, or entity.

Section 12: The arbitration herein described shall proceed to completion upon the merits unless the party objecting hereto obtains a court order stating such arbitration.

**ARTICLE 27- PENSION BENEFIT**

Section 1: The Employer shall contribute to the Hotel Industry Pension Fund the following rates:

| June 1, 2018 | June 1, 2019 | June 1, 2020 | June 1, 2021 | June 1, 2022 |
|---|---|---|---|---|
| $71.72 | $74.99 | $78.41 | $81.98 | $85.72 |

The Employer shall pay this contribution as set forth above for each employee covered by this Agreement and transmit this sum each month to said Fund to provide prevailing pension benefits no later than the 10th day of the following month, together with the names, social security numbers, and gross wages earned by the employees for whom payments were made upon forms required by the Fund.

Section 2: The Employer's contributions to the Fund shall be limited as hereinabove specified.

Section 3: The Employer shall, upon request, be furnished with copies of the regular registration and audit reports, and booklets describing the plan of benefits.

Section 4: In the event that any future legislation be enacted, there shall be no duplication or cumulation of coverage, and the parties shall negotiate such changes as may be required by law.

Section 5: The Employer further agrees to make available to the Fund all records of employees hired, classification of employees, names, ages, social security numbers, and wages paid which the said Fund may require for its sound and efficient operation.

Section 6: In the event the Employer shall become in arrears in payment to the Fund, as outline above, for a period of one month (1) or more, the Employer shall then pay to the Fund the sum of 6% interest, per annum, on all arrearages due to the Fund. Furthermore, in the event the Fund must resort to legal action for arrearage collections, then the Employer shall be responsible for all costs including legal fees and 6% interest for the necessary expenditures involved in the collection of said arrearage payments.

Section 7: For the limited purpose of this Article the Union may be considered as a contributing Employer and officials and employees of the Union and of the Fund may be considered as employees on behalf of whom contributions may be made to said Fund.

Section 8: The Employer shall make contributions for employees on paid vacation and holidays.

Section 9: Notwithstanding anything contained in the Article to the contrary, the Employer's obligation to make the contributions under this Article ceases if the Fund fails to be qualified under Section 4.01 and 5.01 of the Internal Revenue Code. The Union represents that the Fund currently qualifies under Section 4.01 and 5.01 of the Internal Revenue Code and complies in all material respects with the provisions of ERISA. The Union further represents that there has been timely filing on behalf of the Fund of all appropriate reports and all information material with the IRS, the Department of Labor and the Pension Benefit Guaranty Corporation.

Section 10: In the event that the Fund goes into "critical and declining" status at any time during the term of this Agreement, the parties agree to immediately re-open this contract as to this Article only and the Company may at that time withdraw from the Pension should the parties reach mutual agreement regarding retirement benefits.

Section 11: NATIONAL PLUS PLAN (401K)

The Employer shall become a participating Employer in the National Plus Plan (hereinafter called the "Plan") effective January 1, 2018. The Employer agrees to be bound by the Plan's Agreement and Declaration of Trust as may be amended from time to time. The Employer further agrees and consents to the Employer-designated Trustees of the said Plan to serve as such in accordance with the aforesaid Agreement and Declaration of Trust.

The Employer agrees to forward to the Plan on behalf of each participating employee covered by the Collective Bargaining Agreement, before the tenth (10th) of each month, for all payroll weeks ending in the prior calendar month, employee contributions made in accordance with the following language.

Each participating employee may contribute to the Plan through payroll deduction and such deductions will be made based on percentage of pay.

All contributions shall be made payable to the National Plus Plan and shall be remitted to the office of the Plan.

The Employer shall submit monthly, a list showing the names and Social Security numbers of all contributing employees, the amount of employee contributions, and the resulting contributions due (the "Contribution Report").

The Trustees may at any time have an audit made of the Employer's payroll and wage records and other relevant financial records of the Employer in connection with the said contributions and/or reports.

In addition to any other remedies to which the Union or the Plan may be entitled, if the Employer (a) is in default in its contributions for one or more months; (b) is delinquent in submitting a Contribution Report to the Plan for one or more months; (c) refuses to permit the Plan to conduct an audit; or (d) is shown by an audit to owe contributions and/or Contribution Reports to the Plan, it shall pay to the Plan any unreported or delinquent contributions plus interest, retroactive to the due date, at a rate fixed by the Trustees. In addition, if the Plan commences an action to enforce its rights

to collect contributions, obtain Contribution Reports, and/or conduct an audit, the Employer shall pay, in addition to the amounts set forth above, the greater of 20% liquidated damages on any unreported or delinquent contributions or double interest, and all expenses associated with collecting any unreported or delinquent contributions or delinquent Contribution Reports or enforcing the Plan's right to conduct an audit, including, but not limited to costs and legal fees.

The Employer shall provide to the Plan, on a timely basis, information the Plan reasonably requests for the purpose of conducting non-discrimination testing for the Plan.

**ARTICLE 28- HEALTH BENEFITS**

Section 1:   The Total Health and Welfare (including Dental and Administration) contributions rate is $645.47 and shall increase to $753.16 as of October 1, 2017. Contributions shall be increased by 9% on July 1 of each subsequent year of this Agreement.

The Employer shall pay the contribution as set forth above for each eligible employee covered by this Agreement and transmit this sum each month to said Fund no later than the 10th day of the following month, together with the names, social security numbers, and total hours paid for the employees for whom payments were made upon forms required by the Fund.

Should the Fund offer any optional benefits, such optional benefits shall be fully paid by participating employees by means of an authorized payroll deduction form signed by the employee.

Section 2: The Employer's contributions to the Fund shall be limited as hereinabove specified. The requirements of the Fund with respect to when participant contributions begin and end shall not be changed during the term of this Agreement.

Section 3:   The Employer shall, upon request, be furnished with copies of audit reports and booklets describing the plan of the benefits (Summary Plan Descriptions). The Employer shall further be furnished with monthly reports (via email) from the Fund with the names of newly enrolled employees, employees who have dropped coverage in the prior month, and employees who have signed a form declining enrollment in the Fund.

Section 4: In the event that any future legislation be enacted, there shall be no duplication or cumulation of coverage, and the parties shall negotiate such changes as may be required by law.

Section 5: The Employer further agrees to make available to the Fund all records of employees hired, classification of employees, names, ages, social security numbers, and hours paid which the said Fund may require for its sound and efficient operation.

Section 6: In the event the Employer shall become in arrears in payment to the Fund, as outline above, for a period of one (1) month, or more the Employer shall then pay to the Fund the sum of 6% interest, per annum, on all arrearages due to the Fund. Furthermore, in the event the Fund must resort to legal action for arrearage collections, then the Employer shall be responsible for all costs including legal fees and 6% interest for the necessary expenditures involved in the collection of said arrearage payments.

Section 7: For the limited purpose of this Article, the Union may be considered as a contributing Employer and officials and employees of the Union and of the Fund may be considered as employees on behalf of whom contributions may be made to said Fund.

Section 8: The Employer shall make contributions for employees on paid vacation and holidays.

Section 9: Notwithstanding anything contained in the Article to the contrary, the Employer's obligation to make the contributions under this Article ceases if the Fund fails to be tax exempt under Section 5.01 of the Internal Revenue Code. The Union represents that the Fund is tax exempt under Section 5.01 of the Internal Revenue Code and complies in all material respects with the provisions of ERISA and that there has been timely filing on behalf of the Fund of appropriate reports and all informational material with the IRS and the Department of Labor.

Section 10: The Employer shall contribute on all Full Time employees following sixty (60) days of continuous employment. The Company will be relieved of making any further payments to the Fund following six (6) months of employment (for which at least four (4) months of contributions have been made), on the first day of the following month, if the employee has not enrolled based on enrollment information provided monthly by the Fund, until such time as the Fund indicates that the employee has signed an enrollment form. Further, the Employer will be relieved of making any further contributions to the Fund for any employee upon the execution by that employee of a form declining enrollment in the Fund, on the first day of the following month, until such time as the Fund indicates that the employee has signed an enrollment form.

Eligibility for insurance for Full Time employees shall be based on quarterly paid hours. Quarterly eligibility shall be 350 hours except for July, August, and September in which the quarterly eligibility shall be 300 hours. On-call employees and regular Part-time employees shall not be eligible for coverage, unless they meet the requisite hours set forth above. On-call and part-time employees who meet the requisite hours shall be informed by the Employer that they are eligible to enroll for insurance with the Fund.

An employee who fails to meet the eligibility requirements in a given quarter shall be notified in writing by the Employer and shall be afforded a second opportunity to reach the eligibility requirement in the following quarter. Should the employee meet the eligibility requirements in the following quarter, the Employer will continue to make monthly contributions for that employee. In the event that an employee fails to meet the eligibility requirements in two consecutive quarters, the employee shall be notified in writing by the Employer and the Employer shall be relieved from making monthly contributions for that employee until such time that the employee meets the eligibility requirement in a subsequent quarter at which point the employee shall again begin making the specified monthly contributions for that employee.

### ARTICLE 29- SUCCESSOR CLAUSE

Section 1: The Employer may lease, sublease and/or contract out laundry services to outside operators in which the Employer has no ownership interest. Current bargaining unit laundry employees shall be offered employment in other bargaining unit positions for which they are qualified. Any new lease, sublease and/or contract with outside operators for bargaining unit food and beverage work, food and beverage outlets and food and beverage operations beyond that permitted herein shall be subject to renegotiations and mutual agreement with the Union.

Section 2: The parties agree that in the event of a sale, assignment, or lease, the Employer shall be obligated to pay for and/or transfer to the buyer, successor, or assignee, all wages and accrued holiday and vacation benefits due to the employees up to the date of sale, assignment, or lease. If an employee does not become eligible for benefits accrued, the seller shall receive credit for said sums from the buyer.

Section 3: Effective upon ratification, in the event that the Employer sells, transfers, or assigns all or part of its right, title, or interest in the operation covered by this Agreement or substantially all of the

assets used in such operation, or in the event there is a change in the ownership of the Hotel that impacts bargaining unit employees, the Employer shall give the Union reasonable advance notice in writing. The Employer further agrees that as a condition to any such sale, assignment or transfer, it will obtain from any successor a written promise that the successor shall hire a majority of the Hotel's employees represented by the Union (subject to changes in the level of staffing) and will recognize the Union as the collective bargaining representative for the employees in that position represented by the Union, and furnish a copy thereof to the Union, in which event, the Employer shall be relieved of its obligations hereunder to the extent that it has transferred its right, title, or interest. This provision shall expire on the date of the expiration of this Agreement.

### ARTICLE 30- RELIEF APPEALS

Whenever it shall appear to an Arbitrator appointed under this Agreement that the factual situation with respect to the Fontainebleau Miami Beach is such that the wage and hour scales provided in this Agreement will work unusual hardship on such hotel, and affect adversely the interest of the workers therein, such wage and hour scales may be modified, in such hotel, to the extent approved by the Arbitrator.

### ARTICLE 31- PAID SICK LEAVE

All full-time employees that have been employed for the hotel for one (1) year or more shall be eligible to receive three (3) paid sick leave days per year and each calendar year thereafter. This shall be increased to four (4) paid sick leave days as of January 1, 2020. Tipped employees shall be paid the Benefit Rate or their regular rate of pay, whichever is greater. All others will be paid at the regular hourly rate. New employees shall be eligible for paid sick leave pay after one year of employment, prorated for the remainder of that calendar year. All unused paid sick leave days will be paid in full in the last pay period of the calendar year. Paid sick leave days will not be carried over to the next calendar year. Employee annual sick days paid shall not be counted toward the hotel's Time and Attendance Policy.

### ARTICLE 32- GUEST SERVICE COMMITMENT

Section 1: The Parties to this contract recognize that a renewed guest service commitment is required by managers and employees alike.

Section 2: The Employer recognizes that employees, and their input, into guest service matters are a valuable resource and must be encouraged and facilitated. To this end, the parties will seek ways to implement this facet of the commitment by endeavoring to schedule quarterly meetings on this issue including the use of a Joint Labor Management Committee where the parties deem appropriate.

Section 3: The Employer, Union, employees, and managers of the Hotel will strive to anticipate and meet guest needs and to deliver the highest quality guest service. Thus, employees and managers will be expected to deliver quality guest services and shall work together to address guest service issues and maximize the guest experience, without regard to the usual and customary tasks performed, strict job definitions, and past practices which are, or may be, counter-productive or possibly negatively impact the parties' total commitment to improve quality guest service.

Section 4: Provided that no employee shall be displaced, the Hotel, based upon business considerations designed to provide quality guest services, may, utilize employees among various outlets and/or departments to address non-routine situations.

was in-house. The gratuity shall be shared among those employees who serviced the rooms occupied by the group. The Union shall receive upon request, the breakdown of any such gratuity distributed to bargaining unit personnel.

Section 8: The Union and employer will meet and bargain during the first ninety (90) days of the contract over the assignment of credits and agree to address a small number of equitable credit adjustments. In the event that the Employer intends to introduce modifications in its rooms, it shall notify the Union of the proposed changes and will give the Union adequate opportunity to discuss prior to implementation.

Section 9: A sum of four dollars ($4.00) shall be paid to the Room Attendant for the make up of a roll-away bed or a crib. This will be increased by $0.20 beginning on January 1, 2018 and by an increase of $0.20 for each year thereafter.

Section 10: The houseperson workload is defined by the current job description (dated April 23, 2007). In the event the Employer intends to introduce modifications to the Houseperson workload or job requirements, it shall notify the Union of the proposed changes and will give the Union adequate opportunity to discuss said changes. The Company and the Union acknowledge that housepersons will not be used in lieu of scheduling a Linen Attendant. Among other duties, Linen Attendants are responsible for adequately stocking linen closets. Housepersons are issued a Daily Checklist each workday. In the event a houseperson believes s/he will not be able to complete the daily assignment in the time allocated for a legitimate reason, s/he shall advise her/his floor supervisor (no later than two (2) hours before his/her shift is scheduled to end) as soon as s/he is aware, so that other arrangements can be made and the guest experience will not be jeopardized. In the event that a scheduled houseperson does not report to work, the Employer shall call in another houseperson. If after attempts have been made to cover the shift, no employees are able to come in, the manager will prioritize work assignments and make adjustments as needed to cover the open station.

## ARTICLE 36- FAVORED NATIONS

The Parties agree that during the term of this Agreement, should the Union enter into any successor contract with any full service, three star or above hotel in the jurisdiction of Local 355, providing for a combined economic package of wage increases or service charge distribution percentages, paid time off, and health insurance contributions that is more favorable to such hotel than the standards contained in this Agreement, then the Fontainebleau management shall immediately have the benefit of such provisions and they shall automatically become a part of this Agreement. The parties agree that the terms of this article shall not be applicable to first contracts negotiated by Local 355 with any hotels initially organized between the ratification of this Agreement until June 30, 2022 or to any successor contracts that simply maintain more favorable terms and conditions that are already in the contracts that exist at the time of this contract.

## ARTICLE 37- PARKING

The Employer and the Union agree to form a committee to explore ways to work cooperatively to reduce the cost of parking for bargaining unit employees. This committee shall have its first meeting within 60 days of ratification of this Agreement.

via postings by time clocks or such method as is reasonable and mutually agreed upon by the Union and the Employer. Priority shall be given to bargaining unit employees who are scheduled to work less than forty (40) hours during the week.
5) Once an employee commits to working an event, it is considered part of their regular schedules.
6) Bargaining unit members of the Union from nearby hotels and graduates of HEAT training program will be given preference to be On-Call Room Attendants provided they apply for the position and pass the required background checks and On Call Room Attendants shall be paid at the new hire rate and shall have a separate classification seniority list and shall receive the regular wage increases listed in Schedule A in effect at the time the work is performed for all hours actually worked. If an insufficient number of bargaining unit employees and/or On Call Room Attendants are available then the Hotel may utilize agency workers consistent with this agreement.
7) No displacement of employees in the bargaining unit nor erosion of the bargaining unit shall result from utilization of these On-Call Room Attendants or agency employees.
8) The Union will be notified in all instances where agency workers are utilized and provided with information about the extent of such utilization within seven days of such utilization.

The Hotel agrees that there shall be no use of agency employees to perform housekeeping work, except as specifically provided herein.

## ARTICLE 43- COMPLETE AGREEMENT

This Agreement reached as a result of collective bargaining represents the full and complete agreement between the parties, and supersedes all previous agreements and practices which were made in the term of the prior agreement. This language does not preclude discussion between the parties on the subject matter not contained herein.

## ARTICLE 44- DURATION

This Agreement shall remain in effect from July 1, 2017 through June 30, 2022 inclusive, and thereafter from year to year, unless either party, not less than sixty (60) days prior to the anniversary date, signifies in writing its desire to change or modify this Agreement.

In witness whereof, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of this ___ day of March, 2018.

For the Employer:

Fontainebleau Florida Hotel, LLC
d/b/a Fontainebleau Miami Beach
By: _____

For the Union:

UNITE HERE
Union Local 355
By: _____

36